The next case today is Salim T. Al Amiri v. William P. Barr, appeal number 191447. Mr. Linus, you may proceed when you're ready. Thank you. May it please the court, my name is Jay Christopher Linus and I stand before you on behalf of petitioner Salim Al Amiri. And I would ask to be granted two minutes for rebuttal? Yes. Thank you. We're here on a petition for review of a Board of Immigration's decision approving an immigration court decision denying Mr. Al Amiri's claims for asylum, withholding of removal, and convention against torture. The record in this matter, however, taken as a whole, compels a contrary conclusion from what the BIA and IJ decided as to Mr. Al Amiri's claims. Why? Because neither Mr. Al Amiri's proposed particularized social group, otherwise known as a PSG, nor the documentary records submitted by him in support of that PSG were considered as a whole by either the IJ or the BIA. In this matter, both the IJ and BIA narrowed their consideration of Mr. Al Amiri's PSG to westernized and Americanized when his PSG was broader than that and included those who worked with the US military. Similarly, both the IJ and the BIA narrowed their consideration of the evidence in analyzing Mr. Al Amiri's objective fear of future persecution to his individualized testimony and experience alone without considering the documentary non-testimonial evidence he presented to show the greater context supporting his well-founded fear of future persecution, particularly as it related to his work with the US military. And when I speak about that documentary record, I'm referring in particular to the five articles described in my brief at pages 19-22 and in the appendix at pages 7-28. Now, in support of the proposition that the IJ and BIA have a duty to consider the entire record as a whole, and in particular the documentary record, I would turn your attention to the cases of Aguilar, Escoda v. Sessions, Diab v. Ashcroft. Douglas Goldstein, CFP®, is the director of Profile Investment Services and the host of the Goldstein on Gelt radio show. As I read the BIA's opinion, they separately made a nexus ruling, which is that there was no evidence that he had a well-founded fear of persecution based on the fact that it would never be known that he had worked for the US government, correct? I'm just trying to put together those two points because you would think you'd have to identify the particular social group first in order to do a nexus analysis. Yet, when they did the nexus analysis, it seemed like they got the right group. In other words, for purposes of when they analyze nexus, they seem to be focused on the right question about the group, would he be known to have been not just westernized but have worked for the US government. I'm just a little puzzled how we're supposed to review what the BIA did because I'm inclined to agree with you that they never made a separate finding that his working for the US government was not a PSG, but they did make a nexus ruling that seems to me to have implicitly assumed that the particular social group that he had to show the nexus to was the one that you're saying he's asserting, which is that he worked for the US government. Do I have it right? Here's what I would suggest in that regard. In this matter, the IJ and the BIA did mention work with the military. However, they treated the case as if it were a westernized and Americanized PSG proposition. With respect to the nexus analysis, the way I read the BIA's nexus analysis, it seems focused on whether people in Iraq would know that he had worked for the US government if he goes to Iraq. True. I think what I would say to that is there's no evidence they knew at that point. It's more a question of would they find out. If you note the evidence, he mentions it to a neighbor in Iraq while he's visiting and that neighbor tells him straight up, don't say anything about that, don't disclose. I understand there's a question as to whether the BIA erred in its nexus finding about whether there would have been a way of discovering whether he could have a well-founded fear based on the fear of discovery of him working for the US government. I guess I'm asking a prior legal question, which is one possible error the BIA made is it can't have done a nexus analysis that's correct if it didn't get the particular social group right. Correct. You're correct, I think, in reading the BIA in saying that they never made a separate ruling that his claim of being a member of the particular social group of working for the US government was not a particular social group. They never reject that as a PSG. They don't reject it as a PSG, however, they do sort of shoehorn it into what I would suggest is the lesser PSG, the one that's vague, the one that's not particularized or socially distinct, the one that was denied in Ahmed v. Holder in 2010. Is there a separate error that you're claiming the BIA made with respect to the nexus ruling that they never identified the PSG for purpose of a nexus independent of whether if they did identify it, they didn't get the facts right about whether there was a nexus? They did identify it, but did not analyze it as if it were part of, well, I'd say they didn't analyze it as an independent PSG or as part of the greater PSG that I'm suggesting Mr. Alamiri presented to both the IJ and the BIA. And that the cases of Ang and Silva, both decided by this court in 2005, and those petitioners did not win. However, there were pronouncements of law in both Ang v. Gonzalez and Silva v. Ashcroft that speak to employment status as being a basis for a PSG because the people like here working for the U.S. military share a common experiential characteristic. So yes, I would suggest that though both courts, the IJ and the BIA, recognized and mentioned work in the U.S. military, they didn't go forward to actually address that work in the U.S. military as part of the PSG or as a separate independent PSG. Q. Can you respond to the government's contention that Iraqis who assisted the U.S. military in Iraq are distinguishable from Iraqis who provided assistance in the United States? A. I think it's a distinction without a difference. The location where Mr. Alamiri provided the assistance is irrelevant. The danger he will be in in Iraq, if returned there, is that the persecutors will find out that he provided that assistance and will persecute him as a result, whether he provided that assistance in the U.S. or in Iraq. Q. Is there evidence in the record that there is a reason to fear persecution even if the only assistance you gave the U.S. government was assistance given in the United States? A. There's evidence in the record to indicate that assistance to the United States will give rise to persecution. There is no evidence in the record indicating that providing that assistance within the U.S. will give rise to that persecution. Q. How is that not a problem then for you? A. For the very reason I just stated, I believe it's a distinction without a difference. Persecutors in Iraq finding out someone has assisted the U.S. are going to persecute on the basis of that assistance alone, regardless of where it was provided. Q. What evidence in the record supports the statement you just made? A. I don't have any evidence in the record relative to a person who has provided that assistance in the U.S. A. That is correct. Q. I take it, drawing inferences from the view that if a person was assisting the U.S. military in Iraq, they would be subject to persecution. What evidence do you have of that? A. There are five articles both noted in the brief and contained in the appendix, all of which deal with Iraqi's brief indulgence, dealing with interpreters, engineering consultants, thousands of folks who assisted the U.S. military who were all suffering significant persecution as a result of that assistance. Q. Is it your contention that the BIA and the IJ fail to consider this theory, this relevant evidence that you say is relevant, for example, five newspaper articles? A. I do. Q. What is our standard review? Is it de novo or abuse of discretion? A. Your standard is whether a reasonable person reviewing the evidence taken as a whole, whether that would compel a contrary conclusion from what the BIA and the IJ decided as to Mr. Alamiri's claims. Q. Sometimes we'll say, for example, a founded fear based on persecution for religious preferences. We might say that's either immutable or a characteristic that needn't be changed and should not have to be hidden. And so I'm getting at this notion of others may not find out about the fact that he is in a group if it's a cognizable group because the evidence is pretty slim that other people would learn about it. So I guess maybe I have a two part question. The first part being, is the fact or the finding that he could keep his cooperation and assistance hidden relevant? And second, we also sometimes will affirm the BIA's position that you could live in another part of the country. And it seems to me that that may have some relevance here. Is there any evidence in the record about it depends on where you relocate to in the country? A. There's no evidence in the records to indicate that. I understand where you're coming from on that. If a person claiming asylum can relocate to another part of that country, say a huge country like India, avoid persecution in the north of India by living in the south of India. That's a possibility. There's no evidence in the record here. B. So that wasn't even an issue in this case, I take it. A. That wasn't addressed. B. Okay, what about the first part of my question then? Whether he may be safe or his fear may not be well founded because people may not find out about it based on the evidence that's in the record so far. A. That's true. There's no evidence that any potential persecutor knows right now that Mr. Alamiri has assisted the U.S. government. The concern is if it happens. And I would suggest it's not a matter of if but when. I would note two things as well. He was found credible and he was found to have a subjective fear of future persecution. So this is really about the objective fear analysis and whether a reasonable person in his shoes would feel a well-founded fear of persecution based on the facts you have before you. B. All right, thank you. You've reserved some time. A. Thank you. B. Ms. Maher, if you would unmute. B. Good morning. May it please the court? My name is Brooke Maher for the respondent, the U.S. Attorney General. Here today we have a case where Petitioner raised two particular social groups before the IJ. One of westernized and Americanized Iraqis and another one of Iraqis with a history of U.S. military employment. Petitioner right now had the burden to demonstrate that the harm that he fears upon returning was on account of one of those grounds. And the agency reasonably and with the support of substantial evidence of the record found that he had not. Here in this case, the petitioner has made three returns, extended returns, within a period of five years. He took avid steps to leave as he had to do so as he was on probation and he had to go through the formalities of getting permission to leave. He also traveled along with a family member who had also participated in assisting the military for cultural and other, I guess, advisals in New York and Texas for those two things. In all those cases on those returns, neither harm came to the brother or him who had previously been involved in the military. I want a note for the record. Go ahead, please. What was his longest return visit? I do believe that the two longest were, they were a month and a half and then I think there was another one in 2017. They averaged about six weeks. I don't think that there's an exact cause in the records. It just based, all you saw were, if you look at the administrative record, there are the authorizations to leave that he had to obtain from the district court. Were these returns in relation to his attending the funeral of grandparents? I do believe two of them are and the other one was an undisclosed. I did not know the actual departure or I don't have it off the top of my head, but I know that two of them were. I believe the most recent trip he traveled with, I believe it was 13 family members, accompanied him while he was there. He admittedly suffered no harm, suffered, you know, no incidences that he claimed would be, you know, that he fears upon his return. And the government does note that petitioner did file for application as early as 2011. And then, you know, based on a fear of returning and had voluntarily returned. Here, petitioner and his cousin or his brother also testified that the people that do have the anti-American sentiment are the Iraqi people. And he even testified that the Iraqi government itself was actually pro-American. So that also makes it difficult for him to show that it would be on account of and buyer with, you know, the acquiescence of the Iraqi government. Was there a finding on that point by the BIA? The IJ went through the BIA, the board, the board basically with the nexus upheld in like a relatively cursory. You know that. Is that a no? No, I know that I believe that the that the board did uphold the IJ's nexus determination, basically stating. You said the independent of the nexus, he'd have trouble showing government involvement. Oh, no, that would be the IJ. Like he the BIA rested on the nexus. Correct. The BIA only rested on nexus. It did not rely on the no government involvement point. Correct. Correct. Yeah. So, no, but that but the but he but they upheld the IJ's determination and then petitioner fails to show. I mean, also, like I wanted to address petitioner's statement regarding the involvement with the military and how there was a distinction without a difference. I mean, throughout those, even the evidence of record demonstrates that the government was able to observe the people who were working on Iraqi soil and actually made lists and were able to discover people personally. Here, this is based on a speculation that somehow he would be found and then persecuted. But even then, it comes back to is the IJ determined that there's no proof that anybody would be able to discern that without some type of voluntary disclosure. Now, doesn't Mr. Amiri state and didn't he present evidence that he encountered threats of harm when he returned when he was in Iraq? I do believe and I believe if you if you go back on the testimony and if you want specific points regarding this information, he basically testified that he went back and he was stopped because they thought he was Americanized. He said he was wearing shorts. He had a tattoo. He was identifiable. And that swings back to the Americanized, which this court is in the secularized type of westernized person, which this court is repeatedly struck down as being not a group that would be identifiable. I mean, this was not based on the fact that he had any preexisting or continuing relationship working with the U.S. Army or the U.S. government. So why shouldn't his why should his past trips to Iraq without harm, but during which he encountered threats of harm? Way in favor of not finding a well-founded fear of future persecution. Well, I think that you're looking at two separate reasonings for being I mean, he he was he himself even testified that he was he knows the customs if he dressed accordingly, if he did this, that he wouldn't be sought out or looked at. And he admitted that and he admitted that, yeah, it was 130 degrees. I was wearing shorts and a tank top. It was really hot. And that that created an issue for people that they were able to see who he was. And even his own family said we didn't dress in according to the customs, but we know the customs. He even admitted that he would be able to do that. And I think that the immigration judge also noted that this also translates back to the Americanized and westernized claim that that group and he wants you can't transfer that onto the next. You can't use harm for one reason and transfer it onto your next particular social group. He can't he can't piggyback that on there and state that because they looked at him as an American, they're now going to persecute him because they keep he he worked with the United States military while he was in the United States. Is there an issue in this case about whether his assistance to the U.S. military is a cognizable group? I believe so. I believe that they I mean, I believe that the IJ noted that and they found that. But I don't think that the board adequately addressed that. And I think that's why we mostly relied upon the nexus determination. I think I think that the IJ flushed it out a little bit. OK, so if we get past that issue, is is the fact that he assisted the U.S. military something that he should be required to hide? I don't I mean, I don't believe that it's. I don't believe that it would be deemed as a like a protected like a character that he's not required to change or hide. I mean, this was this was years after it had been over a decade. There was like any other. And he's got proof that there's other people that have been there that have worked at home and then come back to, you know, sorry, home being the United States. I don't believe that it would be any different than basically saying like for the Western eyes, I mean, like if he dressed accordingly, it would be it would be no different. I mean, he would he would just have to follow customs. There was there's no issue in this case. Is there that he had a subjective fear? No. OK, so the only question is objective. And I'm I'm still struggling with why is it objectively unreasonable to be in fear that you might be found out? And how how far are you as one supposed to go to hide their past contacts with the U.S. government? I don't believe there's any evidence of record that has anybody having any knowledge outside of his voluntary disclosures. I'm I'm unaware of any case law. I think that begs the question I'm asking. Yeah, but I yeah, but it's just it's I'm not I'm not personally aware of. And forgive me if I if I'm missing anything of anything that requires people that they I mean, like they have to disclose, you know, anything that they had done in the past or in. And I don't know what kind of harm he would be suffering if he did keep it to himself. I don't know if or if he did disclose it, then would he willfully be attempting to put himself out there? There's there's nothing he's got nothing in the record that shows there's any record of him doing it other than his own private disclosure to the individual. So it sounds like that what you are saying is that if he did disclose. His relationship with the U.S. military, or if somehow it was revealed that the. Evidence, including as your brother identified the numerous the reports of attacks on Iraqis employed by the U.S. military. His testimony of kidnapping of his co-workers, his sister's testimony of their recent experiences in Iraq. Make it more likely than not that Mary's life or freedom would be threatened on account of his former employment. And so he had an objectively reasonable basis for fear of persecution. No, I mean, obviously, the government disagrees with that finding. I mean, I think we're getting back to the point where he's conflating what had happened to him and what you're bringing up are incidents that had happened. But there's nothing in the BIA's decision suggests that even if it were found out in Iraq that he had worked for the U.S. government, he would not be at risk of persecution. It may be that you think he wouldn't be. But if I read the BIA's decision, there's not a word in it. So the BIA's decision hinges entirely on what the record shows with respect to how likely it is that somebody in Iraq would find out. OK, so with respect to that, in the BIA's decision, they don't say much about that other than that it wasn't found out when he went on some trips. Correct. So what is the BIA pointing to in the record to support its conclusion that he unreasonably thought that it would be, I don't know, reasonable to think that somebody would find out he had worked for the U.S. government if he went back to Iraq? I believe it stems back down to the petitioner's burden of proof. I mean, he had the burden of demonstrating that he would, in fact, be harmed if somebody found out about it. He returned it for three. He's saying it's reasonable for him to think that somebody would find out. OK. What is the basis for the BIA's conclusion that that was not a reasonable thing to think that it would be found out? Well, I believe, I mean, going back where the three returns after he had actually performed that. Anything besides his own, the fact that he went on visits for six weeks at the most and that during those visits it was not found out. That yes, and that there is and there's no record evidence pertaining to people that have worked with, you know, in the United States versus those that are actually performing duties with the U.S. military while on the soil in Iraq. Counsel, let me ask you an uncomfortable question, or at least I find it uncomfortable, but I feel compelled to ask the question. Under the straightened circumstances in which the federal judiciary finds itself in trying to fulfill our obligation to be open and available to the public, we conduct these proceedings in a way that they are accessible worldwide. So this is a public proceeding that anybody can get access to. What does that do, if anything, to your argument that his status will not be found out? At this point, the government would just basically state that you're limited to the record that's before you and anything that happens beyond this point is going to be beyond you. We can't take judicial notice that this is a public proceeding and that we'll be issuing a public opinion. I mean, you can obviously take judicial notice. However, I mean, the government would still stand that it would not be sufficient to meet his burden of proof. What burden of proof that it will be? That he would be found out. That it would be found out. I mean, as he has also been in public with the other cases that he had were also public and he had returned home without subsequent harm. Other questions from the panel? Thank you very much, Ms. Moore. Mr. Linus, you reserve two minutes. Yes, Your Honors. I'd like to briefly address the issue of return trips. As was noted in the argument, both the IJ and BIA did find that Mr. Alamiri's three trips to Iraq in 2015, 2017, and 2018 severely undercut the extent to which he could have had an objectively reasonable fear of future persecution. I would note that the three cases relied upon by the IJ and BIA in that regard involved negative credibility determinations prior to the consideration of return trips. I would note that Mr. Alamiri was found credible, and he did testify credibly to the extent to which he went on these trips due to grandparent deaths and or funerals. And there's no evidence he visited Iraq because he wanted to or for pleasure or for vacation. He went for family obligation, basically. And in that context, I would suggest that it doesn't undercut the objective fear issue. And I'd suggest that it comports with what I'd call the strong attachment concept that's noted in a number of cases cited in my brief. And according to Mr. Alamiri's credible testimony, he traveled to Iraq despite his fear and not because he didn't have it. Thank you. Thank you both. Thank you, Your Honors. That concludes argument in this case. Attorney Linus and Attorney Maurer, you should disconnect from the hearing at this time.